******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

APPENDIX

## GORDON GEIGER ET AL. *v.* FRANCIS CAREY*

Superior Court, Judicial District of Litchfield
File No. CV-11-5007327-S
Memorandum filed February 25, 2015

*Proceedings*

Memorandum of decision after completed trial to court. *Judgment for defendant in part on complaint and in part on counterclaim.*

*Gordon Geiger*, self-represented, the plaintiff.

*Elizabeth Geiger*, self-represented, the plaintiff.

*James P. Steck*, for the defendant.

*Opinion*

J. MOORE, J.

I

Introduction

The plaintiffs, Elizabeth and Gordon Geiger, mother and son, have brought suit against the defendant, Francis Carey, their next door neighbor, in three counts: trespass, violation of Connecticut's tree cutting statute, General Statutes § 52-560, and malicious erection of a structure, pursuant to General Statutes § 52-570. The first two counts claim that the defendant came onto the plaintiffs' property, cut down a tree, and built a retaining wall. The third count avers that the defendant built a so-called "spite fence" between the parties'[1] properties, blocking the plaintiffs' lake view and reducing sunlight available to the plaintiffs' garden. The plaintiffs request money damages, including the costs of two surveys and the cost of removing the retaining wall and returning the plaintiff's land to its original state, as well as an order requiring the defendant to remove the alleged "spite fence" and punitive damages.

The defendant has denied that he is liable under all counts of the plaintiffs' complaint, has asserted that the statute of limitations, General Statutes § 52-577, bars, as untimely, the allegations of the first two counts, and has filed a counterclaim. The defendant's counterclaim sounds in seven counts: private nuisance, three separate trespass counts, quiet title, intentional infliction of emotional distress, and negligent infliction of emotional distress. The defendant seeks injunctive relief, including orders enjoining the plaintiffs' nuisance, prohibiting the plaintiffs from interfering with the defendant's use of his property and of a common right-of-way, requiring the plaintiffs to remove unsightly and potentially dangerous items from the right-of-way, barring the plaintiffs from using the right-of-way for storage of the plaintiffs' property, and requiring the removal of a tree house/tree platform structure, as well as monetary damages, punitive damages, and an order quieting title.

The court rules for the defendant and against the plaintiffs on counts one and two of the revised complaint. In regard to count three of the revised complaint, the court orders the defendant to remove one section of the fence between the parties' properties, that section closest to the street, according to the schedule set forth below.

The court rules as follows as to the counterclaim. While Gordon Geiger maintains his right, so long as he is a tenant or owner of 58 Tyler Lake Heights Road, to pass and repass on the right-of-way, the court permanently enjoins Gordon Geiger from stopping or loitering on the right-of-way. The court also permanently enjoins Gordon Geiger from placing any barriers, barricades,

or items on the right-of-way. Further, the court orders Gordon Geiger to take down his tree platform, according to the schedule set forth below. Finally, the court awards damages in the amount of $400 to the defendant for the damage to his arborvitae.

## II

### Procedural History

The plaintiffs initiated a cause of action against the defendant in small claims court, by means of a summons and complaint filed on July 25, 2011. On August 18, 2011, the defendant filed, and the court granted a motion to transfer this matter to the Superior Court. The law firm of Lockaby and Perrault filed an appearance in place of each plaintiff on June 25, 2013. On December 5, 2013, the plaintiffs filed a revised complaint in this case in response to the defendant's request to revise. The December 5, 2013 revised complaint is the operative complaint in this matter.

The defendant filed his answer, special defenses, and counterclaim on February 7, 2014. On April 17, 2014, the plaintiffs moved to strike the defendant's counterclaim, arguing that its allegations were not closely related enough to the allegations of the complaint. This court, *J. Moore, J*, denied that motion on September 29, 2014.

On July 10, 2014, Lockaby and Perrault moved for permission to withdraw its appearance for Gordon Geiger. The court, *Pickard, J.*, granted its motion on July 28, 2014. On August 6, 2014, Lockaby and Perrault moved to withdraw its appearance for Elizabeth Geiger. The court, *Pickard, J.*, granted this motion on August 25, 2014. Gordon Geiger, who is not a lawyer, filed an appearance on August 21, 2014, purportedly on behalf of "all plaintiffs."[2] Elizabeth Geiger filed an appearance on the date of the trial.

Trial took place before this court on October 21, 2014. The plaintiffs filed an answer to the counterclaim just before trial on that day. Upon request of the defendant, the court undertook a site visit on November 3, 2014. Gordon Geiger and the defendant were present, each on his own property, during the site visit. On November 5, 2014, the plaintiffs filed a motion to submit additional evidence, which the court denied on February 4, 2015.

Two instances of the proof not conforming to the plaintiff's operative complaint occurred during trial. The first deals with the statute of limitations as it may apply to the counterclaim. The plaintiffs never filed a special defense to the defendant's counterclaim, but, during trial, Gordon Geiger raised a statute of limitations defense to certain aspects of the counterclaim. Trial Transcript, 66:25–67:1, October 21, 2014. The second has to do with the plaintiffs' claim for malicious erection of a structure. In the revised complaint, the plaintiffs allege malicious erection by the defendant of the fence between the two properties and cite § 52-570.

which authorizes money damages for the owner of the burdened property. The plaintiffs' revised complaint does not allege a violation of General Statutes § 52-480, which allows for injunctive relief in favor of the owner or lessee of property to remedy a malicious structure as defined in § 52-570. The plaintiffs' revised complaint, however, seeks injunctive relief, in the form of an order requiring the immediate removal of the fence.

"[I]t is the established policy of the Connecticut courts to be solicitous of pro se litigants and when it does not interfere with the rights of other parties to construe the rules of practice liberally in favor of the pro se party."[3] (Internal quotation marks omitted.) *Rowe* v. *Goulet*, 89 Conn.App. 836, 841, 875 A.2d 564 (2005). Under Practice Book § 10-62, in "all cases of material variance between allegation and proof, an amendment may be permitted at any stage of the trial." Moreover, the trial court has discretion to allow an amendment of a pleading before, during, or after trial to conform to the proof. *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 433, 486, 970 A.2d 592 (2009). One significant factor for the court to consider in deciding whether to exercise its discretion to allow an amendment to a pleading is any potential injustice that may result. *Summitwood Development, LLC* v. *Roberts*, 130 Conn. App. 792, 800, 25 A.3d 721, cert. denied, 302 Conn. 942, 29 A.3d 467 (2011), cert. denied, U.S. , 132 S. Ct. 1745, 182 L. Ed. 2d 530 (2012). There would not be any injustice to the defendant were the court to allow these two amendments.

In regard to the statute of limitations issue, it is noteworthy that when Gordon Geiger raised this issue as an objection to evidence proffered by the defendant, the defendant's counsel, in arguing against the objection, did not raise the issue of whether such a defense had been pleaded.

Further, as of the trial date, the defendant had been on notice for more than ten months of the claim for injunctive relief being advanced by the plaintiffs. This prayer for relief, which could only be awarded under § 52-480, was contained in the revised complaint filed on December 5, 2013. Finally, the defendant, being the plaintiffs' next door neighbor, was aware that the lessee Gordon Geiger, rather than the owner Elizabeth Geiger, who lives presently in Maine, was the party who allegedly was directly and immediately harmed by the building of the fence.

In light of the foregoing, the court will consider the plaintiffs' response to the counterclaim to be amended to include a special defense of the statute of limitations and the plaintiffs' prayer for relief to include a claim under § 52-480 for injunctive relief.

### III

### Contentions of the Parties

A

The Plaintiffs' Contentions

The plaintiffs alleged the following facts in the revised complaint.

Elizabeth Geiger is the owner of 58 Tyler Lake Heights, Goshen, Connecticut. Gordon Geiger is her son, has full possession rights to the property, and is her successor in interest there. The defendant's property is adjacent to that of the plaintiffs.

Around April, 2006, Gordon Geiger returned home from out of state and discovered that a 400 year old oak tree in the rear of the plaintiffs' property had been cut down. When Gordon Geiger asked the defendant what had happened, the defendant told him the tree was on the defendant's land and he had a right to cut it down.

On or about April, 2006, Gordon Geiger discovered that the defendant had built a retaining wall, measuring approximately thirty-five feet long and four feet high, near where the oak tree had grown. A large amount of backfill was contained within the retaining wall.

On or about October, 2008, the defendant admitted that both the oak tree and the retaining wall were on the plaintiffs' property and not the defendant's property. As a result, the plaintiffs hired a surveyor to determine on whose land the oak tree had stood and the retaining wall had been built. Upon information and belief, the defendant removed the survey markers while Gordon Geiger was at work. In June, 2009, a subsequent survey was conducted by another surveyor which preliminarily found that both the oak tree and the retaining wall were on the plaintiffs' land. This conclusion was confirmed by a third survey conducted on June 17, 2010.

The above described actions of the defendant constitute trespass on Elizabeth Geiger's property ownership rights and on Gordon Geiger's property possession rights.

The defendant's action in cutting down the oak tree was a wilful violation of § 52-560.

After receipt of a demand letter from counsel then representing the plaintiffs, dated on or about July 30, 2009, the defendant built a fence measuring over six feet in height, in violation of state and city ordinance, and approximately 160 feet long. The defendant erected this fence maliciously, with the intent to injure enjoyment of the plaintiffs' land. This fence serves no purpose for the defendant other than to annoy and/or injure the plaintiffs in their use of their land. The fence blocks the view of Tyler Lake from the plaintiffs' land and prevents adequate sunlight for the plaintiffs' gardens. The fence is a "spite fence" under § 52-570.

B

### The Defendant's Contentions

The defendant asserts the tort statute of limitations, § 52-577, as a defense to the allegations pertaining to the cutting down of the oak tree and the building of the retaining wall.

The defendant alleges the following facts in his counterclaim.

The defendant's property abuts the plaintiffs' along the west and northwesterly boundaries of the defendant's property. A thirty-five-foot right-of-way runs from Park Road along the defendant's easterly boundary line, then turning first northwesterly and then southwesterly along the plaintiffs' boundary line. Both the defendant and the plaintiffs have a deeded right to use the right-of-way to pass and repass. The right-of-way is the only means of access to the defendant's building lot 07–10A–015–00.[4]

The defendant obtained a survey of his property on or about April 2013.

The plaintiffs committed a private nuisance in the following ways. Upon information and belief, the plaintiff knowingly destroyed, disturbed, or removed some of the defendant's survey markers. As a result, the surveyor has had to come to the defendant's property three separate times to replace the markers. The plaintiffs have littered their property and the right-of-way with broken, rusty appliances, a junk car, construction equipment, jugs of unknown chemicals, garbage, an indoor range installed outdoors, and unfinished excavations, causing the plaintiffs' property and the right-of-way to be unsafe and unsightly. The condition of the plaintiffs' property negatively impacts the value and marketability of the defendant's property, as well as unreasonably interferes with his use and enjoyment of his property and the right-of-way. Unless this nuisance is enjoined, the defendant will suffer irreparable harm for which he has no adequate remedy at law.

The counterclaim has alleged three different categories of trespass.

First, to the extent that items described in the second to last paragraph were placed within the right-of-way, they interfere with the defendant's ability to pass and repass over the right-of-way as set forth in his deed. Gordon Geiger has intentionally placed other items in the right-of-way, including vehicles, boulders, a spindle wheel, a chair, and a coffee cup. On several occasions, Gordon Geiger has harassed and annoyed the defendant while sitting on the chair at the spindle wheel. This conduct blocks the defendant's access to his building lot.

Second, Gordon Geiger continues to place debris, fill, boulders, and snow at the entrance to the defendant's driveway to impede access to the defendant's home.

Additionally, Gordon Geiger, in the winter of 2013 to 2014, dumped snow on top of screening trees and shrubs along the defendant's back boundary line, killing the trees.

Third, the plaintiffs have built a tree platform on the westerly boundary of the defendant's property, which encroaches approximately 1.5 feet upon the defendant's property.

The defendant moves to quiet title, claiming that the tree platform, unless enjoined and restrained, will cause grave and irreparable injury to the defendant by depriving the defendant of the use of that portion of his property on which the platform encroaches. There is no adequate remedy at law for this encroachment.

Gordon Geiger has intentionally inflicted emotional distress upon the defendant by engaging and continuing to engage in a pattern of harassing behavior, including (1) sitting on the tree platform and verbally harassing, staring at, intimidating, and making noises at the defendant; (2) accosting and continuing to accost the defendant in the defendant's backyard; and (3) on or about January 31, 2014, parking his truck for more than five minutes in the right-of-way just outside the defendant's window, and staring into the defendant's home. The defendant is uncomfortable using his own backyard and makes all effort to minimize the time he spends in his backyard.

The plaintiffs have negligently inflicted emotional distress upon the defendant through all of the actions set forth above.

## IV

## Findings of Fact

The court informed the parties at the beginning of the trial that it would separate out relevant from irrelevant evidence. Trial Tr., 15:1–6. That being said, a plethora of information was introduced that was not probative of any issues raised in the pleadings. The court's findings of fact pertain to only that evidence that is relevant to the pleadings. The court finds the following facts.

### A

### Background Facts[5]

The parties are next door neighbors on Tyler Lake in Goshen. Elizabeth Geiger is record owner of her property, 58 Tyler Lake Heights (the Geiger Property), although she currently lives in Bass Harbor, Maine. Her son, Gordon Geiger, is a tenant in possession of the Geiger Property, providing property maintenance and tax payments as consideration to his mother in lieu of rent.[6] The defendant lives just to the east of the plaintiffs, at 3 Park Road, Goshen (the Carey Property), abutting the Geiger Property. The parties also share and have rights to use a common right-of-way that provides

access to the Geiger Property and to a building lot owned by the defendant (the Carey Building Lot). The Carey Building Lot is located behind and slightly to the east of the Carey Property. Use of the right-of-way, also called the thirty-five foot passway, by the parties, is the source of many of the issues between the parties. It is located just to the east of the defendant's gravel driveway, and proceeds away from Park Road, parallel to the defendant's driveway, providing access to the Carey Building Lot, before taking an almost 90 degree turn left to provide access to the back of the Geiger Property. The right-of-way, therefore, sits behind both the Geiger and the Carey Properties.

B

Facts Pertaining to the Plaintiffs' Counts One and Two

Neither the plaintiffs nor the defendant put in exact evidence of when the oak tree at issue was removed. Gordon Geiger, however, testified that he discovered that the tree was down when he returned home from living out of the state on or about April, 2006. Therefore, the felling of the oak tree took place before April, 2006. The defendant's exhibit D confirms the defendant's testimony that this tree was originally damaged in a storm, split more or less down the middle, and that it fell, at least partially, onto the defendant's property. The downed tree crushed a shed, which was located on the property of either the defendant or the plaintiffs. The court finds credible the defendant's testimony that he called Elizabeth Geiger in Maine and that she told him to cut the tree up.[7] The court also finds credible the defendant's testimony that he cut the tree into "manageable sections to get it off of" his property. Trial Tr., 48:26–49:16. This testimony is confirmed by the fact that those portions of the tree not on the Carey Property remain next to the retaining wall on the Geiger Property.

The defendant erected the retaining wall on the plaintiffs' property. See Plaintiffs' exhibit 1. The defendant built the retaining wall in 2001. As with the oak tree, Gordon Geiger discovered the retaining wall when he returned to Goshen after living out of the state on or about April, 2006. The court finds credible the defendant's testimony that the retaining wall was necessary because a drainage area serving the backyards of both parties would become blocked with silt, flooding both properties and backing up their septic tanks. The court also finds credible the defendant's essentially uncontroverted testimony[8] that he contacted Elizabeth Geiger in Maine, explained the situation to her, and that she told him "to do whatever you have to do to rectify the situation; I [Elizabeth Geiger] can't make it down there." Trial Tr., 101:7–9. At that time, the Geiger Property was rented to nonrelated tenants and Gordon Geiger was living out of state.

The plaintiffs did not put on any evidence that the

defendant removed survey markers while Gordon Geiger was at work.

## C

### Facts Pertaining to the Plaintiffs' Count Three

The defendant built what can be described as a wooden stockade fence between the parties' properties. It has three support cross beams and a flat, thinner horizontal top beam. Further, the court had the opportunity at the site visit to personally observe the fence and finds that, in and of itself, the fence is not offensive to the sight. Additionally, the court observed, during its site visit, that the fence is similar to other fences in the neighborhood.[9] The fence is approximately 170 feet long. Defendant's exhibit A. Although the plaintiffs claim that the height of the fence violates city and state ordinances, the plaintiffs did not submit any such ordinances as exhibits in the case. The fence has been built entirely on the defendant's property; Plaintiffs' exhibit 1 and Defendant's exhibit A; set back approximately twenty inches from the property line. The completed fence now sits between thirty feet; Defendant's exhibit A; to just less than forty feet; Plaintiffs' exhibit 1; from the northern edge of the street parallel to each party's property line and between ten feet; Defendant's exhibit A; to 17.5 feet; Plaintiffs' exhibit 1; from the south side of each party's property line. The fence blocks the plaintiffs' view of Tyler Lake, except for the first fifteen feet or so from the plaintiffs' property line. The fence also prevents about 50 percent of the plaintiffs' garden from receiving sunlight coming from the northeast, but does not block sunlight coming from other directions. Plaintiffs' exhibits 1 and 10. The 50 percent or so of the plaintiffs' garden that is blocked from northeasterly sunlight, however, looks, in an exhibit submitted by the plaintiffs, drier than the areas of the garden that are not blocked by the fence. Plaintiffs' exhibit 10.

On its site visit, the court observed that Gordon Geiger (1) stored firewood on his side of the fence, taking advantage of the top horizontal cross beam as protection from the elements, and (2) built a children's slide on his side of the fence.

The defendant began building the fence from the rear of his property toward the street in 2006. Early on in the process, a portion of the fence was also built closer to the street. Defendant's exhibit K-2. He built the fence at that time to block his view of and to place a barrier between himself and objects that Gordon Geiger had left in the rear portion of the right-of-way and in the backyard of the Geiger Property. Gordon Geiger and/or his agent were also excavating in that area at that time. Defendant's exhibit G-7. The defendant also initially built the fence because his niece had been hurt by sharp objects on the property. In 2006, soon after the defendant began to build the fence, Gordon Geiger

strung, on the defendant's property and connected to a "No Trespassing" sign erected by the defendant, a wire fence between two completed sections of the defendant's fence. Defendant's exhibit K-2. The defendant later continued to build the fence from the back to the front of the property, as his relationship with Gordon Geiger broke down. As the defendant put it, he wasn't "seeing eye-to-eye" with Gordon Geiger, he wanted complete separation from Gordon Geiger and, as a result, he built the fence. Trial Tr., 78:1–4. The defendant submitted ample evidence confirming multiple activities undertaken by Gordon Geiger since the building of the fence in the rear of the parties' properties from which a reasonable person would want to be sheltered. These activities include storage of unknown liquids and large junk-like objects, and construction and excavation activities. No such evidence was presented as to that portion of the fence that is closest to the street. Gordon Geiger's view of Tyler Lake is blocked by that portion of the fence closest to the street.

### D

### Facts Pertaining Generally to the Defendant's Counterclaim

The defendant offered no evidence that Elizabeth Geiger committed any of the alleged acts set forth in the counterclaim. All of the defendant's proffered counterclaim evidence pertained to acts allegedly committed by Gordon Geiger.

### E

### Facts Pertaining to the Defendant's Counterclaim Count One

While the defendant submitted evidence that a survey marker on his property had been buried; Defendant's exhibit K-1; there was no evidence submitted with personal knowledge that Gordon Geiger had buried the marker.

While the defendant submitted substantial evidence that Gordon Geiger had, from time to time, strewn the right-of-way and his backyard with such items as barrels, pipes, large junk items, rocks, wood, plastic jugs of unknown liquid, and had performed filling operations and excavations therein, the evidence concerning the conditions alleged in count one (1) revealed that these conditions occurred more than three years before the counterclaim was filed, on February 7, 2014, and (2) did not provide the court with clarity as to how long such conditions persisted. For example, exhibit E, which depicts a tremendous amount of junk immediately behind the defendant's backyard, must have been taken before the winter of 2010 to 2011, because it shows healthy arborvitae which were, according to the defendant, harmed in the winter of 2010 to 2011. Moreover, the defendant first testified that his exhibit F photos were taken in 2006 to 2007: trial tr.. 52: but later

testified that they were taken between 2009 and 2010. The defendant's exhibit G consisted of a series of photographs taken between 2008 and 2010, with the exception of G-7, which was taken in 2006. The defendant did not testify as to how long any of these conditions persisted.

F

Facts Pertaining to the Defendant's Counterclaim
Count Two

The defendant's exhibit S-2, a photograph taken by the witness Charles Barber, another neighbor, on March 25, 2011, depicts a boat, a car, a pickup truck, and a backhoe appearing to be that of Gordon Geiger blocking the defendant's access to the Carey Building Lot. During his testimony, Mr. Barber identified the right side of defendant's exhibit S-2 as illustrating the access to the Carey Building Lot, but did not specifically identify the vehicles as belonging to Gordon Geiger.

In 2006, Gordon Geiger moved a spindle table with a coffee cup atop it and a folding lawn chair on the right-of-way at a spot close to the defendant's home for over a month. Defendant's exhibits M-1 through M-4; Defendant's exhibits S-3 and S-4. Gordon Geiger would sit at the chair from time to time during this period. This spindle table interfered with the defendant's right to pass and repass on the right-of-way, but the table did not directly block the entrance to the Carey Building Lot.

The defendant submitted into evidence warranty deeds to the Carey Property and the Carey Building Lot as defendant's exhibits R and Q, respectively. Each of these exhibits evidence the defendant's right to pass and repass upon the right-of-way. The plaintiffs did not submit any such documentary evidence. The defendant, however, alleges in his counterclaim that Elizabeth Geiger has a "deeded right to pass and repass over passways adjoining 58 Tyler Lake Heights . . . ." The defendant also alleges that Gordon Geiger is a tenant at this property. The court considers these two allegations, taken together, to comprise a judicial admission that Gordon Geiger had a right to pass and repass upon the right-of-way. Gordon Geiger, however, does not have a right to loiter upon the right-of-way.

Many of the items discussed in the second paragraph of the "Facts Pertaining to the Defendant's Counterclaim Count One" impinge upon the defendant's rights to pass and repass over portions of the right-of-way. With the exception of the items found in defendant's exhibit S-2, however, those items are not impeding access to the Carey Building Lot or the Carey Property. The defendant has not appeared and cannot appear in a representative capacity to protect the rights of other people potentially affected by these blockages, including James D. and Pamela Hicks and Charles J. and Lisa C. Barber. Defendant's exhibit A.

## G

### Facts Pertaining to the Defendant's Counterclaim Count Three

Gordon Geiger has placed debris, fill, boulders, and snow at the entrance to the defendant's property. The defendant's exhibit I, 1–12 depicts snow blocking at least a portion of the defendant's driveway. This snow dumping took place in the winter of 2013 to 2014. The boulder/debris incident, depicted on defendant's exhibit S-8, occurred on July 19, 2010.

In the winter of 2010 to 2011, snow was dumped onto four large arborvitae; Defendant's exhibits H-1 through H-3; that the defendant had planted at the rear of his property to provide a barrier between his property and the plaintiffs' property, and killed them. The defendant valued each tree at $650.

## H

### Facts Pertaining to the Defendant's Counterclaim Count Four

The plaintiffs' tree platform encroaches onto the property of the defendant approximately 1.5 feet. Defendant's exhibit A. The defendant's fence, over which the tree platform extends, was built on the defendant's property twenty inches back from the parties' property line.

## I

### Facts Pertaining to the Defendant's Counterclaim Count Five

Gordon Geiger built the tree platform after the defendant built his fence between the parties' properties. The tree platform sits well above the fence. Gordon Geiger has placed two folding chairs; Defendant's exhibit J-1; and a park bench; Defendant's exhibit J-2; on top of the tree platform. Gordon Geiger testified that his "kids play up there all the time"; trial tr., 137:5–6; at least a "couple of times a week." Trial Tr. 140:14. Gordon Geiger admits being up on the tree platform ten times in total. Trial Tr., 137:6–7, 140:16–18. Gordon Geiger has installed a slide for his children on his side of the fence. The tree platform sits approximately fifty feet from the closest point of the defendant's home; Defendant's exhibit A; and provides a bird's eye view of the defendant's home, as well as of the lake.

## J

### Facts Pertaining to the Defendant's Counterclaim Counts Six and Seven

There is a tremendous amount of hostility between Gordon Geiger and the defendant. It is almost palpable. Observing the parties while on the site visit confirmed this conclusion. Gordon Geiger has sat on his tree platform, from which he can see the defendant's home,

which is only fifty feet away at its closest point. Gordon Geiger has admitted that he, albeit more than three years before the counterclaim was filed, threw ashes on the defendant's truck after a disagreement about the use of the right-of-way. The ashes are depicted on defendant's exhibits S-5 and S-6. This event occurred in October, 2009. Gordon Geiger left boulders and debris on the defendant's driveway in July of 2010. The defendant testified that Gordon Geiger parked outside of his home on January 31, 2014, and stared into his home for more than five minutes, but there is no photograph of this event or other corroboration and the court finds that the defendant did not present sufficient evidence to establish that this event occurred as he described.

Within the three year period before the counterclaim was filed, Gordon Geiger (1) blocked at least a portion of the defendant's driveway entrance with snow, adding that the defendant's driveway rights were being revoked, and (2) accosted the defendant, as well as his guests, witnesses Charles Barber, Dana Curran and Frances Kay Breakell, while the four were conversing on the defendant's property. During that encounter, Gordon Geiger insulted Mr. Barber as the result of a car accident he had been in, called Mr. Curran "Donna" instead of "Dana," insulted the defendant for drinking episodes, and told the group to get used to him, because he was going to be around for forty years and didn't intend to be civil. Gordon Geiger also referred to himself by means of using a racial slur.

V

Conclusions of Law, Rulings, and Orders of the Court[10]

As a threshold matter, the court needs to remind the parties that "[t]he facts at issue are those alleged in the pleadings." (Internal quotation marks omitted.) *Weiner* v. *Clinton*, 106 Conn. App. 379, 382, 942 A.2d 469 (2008). Moreover, "[t]o properly raise a theory of liability in the trial court, a party must articulate it in advance as an 'early warning,' so that an opposing party may 'frame its presentation of evidence' accordingly." *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 620, 99 A.3d 1079 (2014). As mentioned above, the parties, during trial, raised issues that often ran far afield of what was alleged in the operative pleadings, both in terms of the subject matter of the allegations advanced and in terms of alleged misbehavior that had occurred far outside of the statute of limitations. At times, each side appeared bent on portraying the opposition in as negative a light as possible. As a result, the court needs to remind the parties that the court can only decide the issues properly brought before it in written pleading form; see *New Haven Sand Blast Co.* v. Dreisbach, 104 Conn. 322, 328–29, 133 A. 99 (1926); and cannot solve all the problems on the border of 58 Tyler Heights Road and 3 Park Road. Additionally, as mentioned above, the

court, in response to more than one objection based on relevance, indicated to the parties that it would separate out the relevant from the irrelevant evidence at the time of the decision. Therefore, the conclusions of law set forth in this section pertain only to those issues that are both relevant and properly before the court.

## A

### Plaintiff's Counts One and Two: Trespass and Violation of Tree Cutting Statute

The elements of "an action for trespass are (1) ownership or possessory interest in land by the plaintiff; (2) invasion, intrusion or entry by the defendant affecting the plaintiff's exclusive possessory interest; (3) done intentionally; and (4) causing direct injury." (Internal quotation marks omitted.) *Bristol* v. *Tilcon Minerals, Inc.*, 284 Conn. 55, 87, 931 A.2d 237 (2007); see also *State* v. *Lamar Advertising of Hartford*, Superior Court, judicial district of Hartford, Docket No. CV–08–5020325–S (October 21, 2010, *Sheldon, J.*). Our Supreme Court has held that "[i]t is axiomatic that entry upon property with permission of the owner, absent subsequent acts of abuse, is a defense to a claim of trespass." *Carothers* v. *Capozziello*, 215 Conn. 82, 101, 574 A.2d 1268 (1990); see also *State* v. *Lamar Advertising of Hartford*, supra. Further, "[o]ne who effectively consents to conduct of another intended to invade his interests cannot recover in an action of tort for the conduct or for harm resulting from it . . . ." (Internal quotation marks omitted.) *State* v. *Lamar Advertising of Hartford*, supra.

Connecticut's tree cutting statute, General Statutes § 52-560, provides in relevant part: "Any person who cuts, destroys or carries away any trees, timber . . . standing or lying on the land of another . . . without license of the owner . . . shall pay to the party injured . . . three times the reasonable value of any other tree, timber . . . but when the court is satisfied that the defendant was guilty through mistake . . . it shall render judgment for no more than its reasonable value." Section 52-560 embodies the common-law rule pertaining to "an action for a trespass to the land to which the trees in question were appurtenant." *Stanley* v. *Lincoln*, 75 Conn. App. 781, 785, 818 A.2d 783 (2003). "[Section 52-560] does not give a new and independent cause of action, but prescribes the measure of damages in cases where compensatory damages would, in the absence of the statute, be recoverable." (Internal quotation marks omitted.) Id., 786. An action under § 52-560, therefore, is an action in trespass with a specifically prescribed measure of recovery of damages. As with trespass, the plaintiff cannot recover if the defendant had the "license," or permission of, among others, the owner. Failure to prove the elements of the underlying trespass dooms an action under § 52-560.

The court finds for the defendant on both of the plaintiffs' trespass allegations: the alleged cutting down of the 400 year old oak tree and the building of the retaining wall, as well as on the claim of violation of § 52-560, the tree cutting statute. As explained in further detail immediately below, the defendant entered the plaintiff's property with permission in regard to each allegation, the claim for the fallen tree is barred by the relevant statute of limitations, and both the cutting up of the fallen tree and the construction of the retaining wall, rather than harming the plaintiffs, provided a benefit to the plaintiffs.

The plaintiffs have established an ownership (in the case of Elizabeth Geiger) or possessory (in the case of Gordon Geiger) interest in the land affected by the alleged tree cutting and by the construction of the retaining wall. The plaintiffs have also proven, by the defendant's admission, that he entered the Geiger Property intentionally both to cut up the oak tree and to conduct the construction of the retaining wall. The plaintiffs cannot recover any damages from the defendant for either allegation of trespass, however, because Elizabeth Geiger gave her permission for the defendant to enter her land to cut up the tree and to build the retaining wall.

Moreover, in regard to the fallen tree, the court finds that the defendant did not cut down the tree as alleged. The tree was first split virtually down the middle by a storm, which resulted in a large part of the tree landing on the Carey Property. The court finds that after contacting Elizabeth Geiger, who gave him permission to do so, the defendant cut portions of the tree into manageable pieces and hauled them away from the property. Even absent permission, the defendant was within his rights to remove the portions of the tree that had fallen on to the defendant's property. See *McCrann* v. *Town Plan & Zoning Commission*, 161 Conn. 65, 75, 282 A.2d 900 (1971). As a result, the plaintiffs did not sustain their burden to prove that the defendant's intentional entry upon their land harmed them. Therefore, the plaintiffs did not sustain their burden of proof in regard to the elements of trespass and the allegations of alleged tree cutting under the statute.[11]

Even if the plaintiffs had presented sufficient evidence for a claim of trespass arising out of removal of the tree, the claim is barred by the statute of limitations. The dismantling of the tree took place before April, 2006, the time period in which Gordon Geiger returned home to 58 Tyler Lake Heights Road and first noticed that the tree had fallen. The operative statute of limitations for trespass is § 52-577, which provides that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." (Internal quotation marks omitted.) *Rickel* v. *Komaromi*, 144 Conn. App. 775, 782, 73 A.3d 851

(2013). When analyzing whether a trespass claim is time barred, "the only facts material to the trial court's decision . . . are the date of the wrongful conduct alleged in the complaint and the date the action was filed." (Internal quotation marks omitted.) Id. Since the plaintiffs did not file their original small claims action until July 25, 2011, and the tree was removed prior to April, 2006, the claim for the loss of the tree is barred by the operation of § 52-577.[12]

The plaintiffs cannot recover on the trespass claim pertaining to the retaining wall because the retaining wall benefitted, rather than harmed, the plaintiffs. As mentioned above, harm is an essential element of an action in trespass. At the time that the defendant secured the permission of Elizabeth Geiger to build the retaining wall, the drainage area nearby would often become silted over, flood the backyards of both parties, and cause the septic tanks to back up in the yards of both parties. The defendant explained this to Elizabeth Geiger, who was then living in Maine. Gordon Geiger also was living out of state at this time. Elizabeth Geiger told the defendant, as mentioned above, to do whatever he had to do to rectify the situation and that she couldn't make it down to Connecticut at that time. The defendant undertook to remedy the situation at his own cost in a manner that benefitted both him and the plaintiffs. In the absence of harm, the plaintiffs cannot recover on this aspect of their trespass claim.[13]

B

Plaintiff's Count Three: Malicious Erection of Structure under General Statutes §§ 52-570 and 52-480

General Statutes § 52-480 provides in relevant part: "An injunction may be granted against the malicious erection, by or with the consent of an owner, lessee or person entitled to the possession of land, of any structure upon it, intended to annoy and injure any owner or lessee of adjacent land in respect to his use or disposition of the same."

General Statutes § 52-570 provides: "An action may be maintained by the proprietor of any land against the owner or lessee of land adjacent, who maliciously erects any structure thereon, with intent to annoy or injure the plaintiff in his use or disposition of his land."

These statutory sections set forth what are commonly referred to as "spite fence" actions; *Chase & Chase, LLC* v. *Waterbury Realty, LLC*, 138 Conn. App. 289, 302, 50 A.3d 968 (2012); one, § 52-480, for injunctive relief that may be brought by an owner or lessee of adjacent land and the other, § 52-570, for legal damages that may be brought by the proprietor of land. The word "proprietor" means "[a]n owner . . . ." Black's Law Dictionary (9th Ed.2009). The elements essential to prove each statutory section are the same. Each statute requires the following: (1) the defendant to have built

a structure on said defendant's land; (2) the erection of the structure must have been malicious; (3) the defendant must have intended to injure the enjoyment of the adjacent landowner's land by the erection of the structure; (4) the structure must impair the value of the plaintiff's land; (5) the structure must be useless to the defendant; and (6) the enjoyment of the plaintiff's land must be, in fact, impaired. *Chase & Chase, LLC* v. *Waterbury Realty, LLC*, supra, 302. Our Supreme Court has ruled that all or only a portion of a fence may be maliciously erected. *DeCecco* v. *Beach*, 174 Conn. 29, 30–33, 381 A.2d 543 (1977). For the reasons set forth below, the court holds that the plaintiffs have satisfied their burden to show that one portion of the fence is a maliciously erected structure and needs to be removed.

Deciding whether a structure has been erected maliciously does not involve a journey deep into the defendant's heart. "Whether a structure was maliciously erected is to be determined rather by its character, location and use than by an inquiry into the actual motive in the mind of the party erecting it." Id., 32. As mentioned above, the fence in this case is not offensive to the sight. The plaintiffs' exhibit 6 reveals, additionally, that the defendant's fence is similar to other fences in the neighborhood. This conclusion was confirmed for the court on its site visit. Much of this fence is indeed useful to the defendant: the sections of the fence farthest to the rear (away from the street) block the defendant's view of junk items and what the defendant accurately described as "blight" left in the plaintiffs' backyard or on the right-of-way by Gordon Geiger. The middle and most of the sections of the fence closer to the road provide a valuable privacy screen for the defendant from Gordon Geiger's home. Given the acrimonious history between Gordon Geiger and the defendant, this privacy screen is certainly useful.[14] Further, there was no evidence, direct or circumstantial, that the building of these such portions of the fence was undertaken maliciously or with intent to injure the plaintiffs. Therefore, the plaintiffs have failed to prove essential elements (2), (3), and (5) above of this cause of action in regard to the overwhelming portion of the fence.

The same, however, cannot be said for the very first section of the fence, namely that section closest to the road. This portion of the fence is depicted as the left of two sections of the fence photographed in defendant's exhibit J-1. Once again, as stated above, Connecticut case law instructs the court to review the character, location, and use of the fence built to ascertain whether the fence was maliciously erected. "It is quite possible for a structure to bear on its face . . . convincing evidence that it was intended for a legitimate purpose, or that it was intended to injure the adjacent land and its owner. . . . The intention is not the motive from which it may have sprung, but the established purpose, from

whatever motive, to use the land in a manner not justified by its ownership, and forbidden by law." (Internal quotation marks omitted.) *DeCecco* v. *Beach*, supra, 174 Conn. 32.

The front most part of the fence, that part closest to the road, sits approximately 17.5 feet from the property line of each party that parallels the street. Plaintiffs' exhibit 1. The plaintiffs' front porch sits approximately 29.7 feet from his street side property line. Plaintiffs' Exhibit 1. The defendant's home sits approximately seventy-five feet from his street side property line. Because of where the parties' homes are situated, the first section of the fence serves no useful purpose as a screen for the defendant from unsightly objects in the plaintiffs' backyard or on the right-of-way, but does indeed block the view of Tyler Lake from the plaintiffs' property. Plaintiffs' exhibit 6, taken over the top of the fence, demonstrates the view of the lake that the plaintiffs would have if the fence were not there. The deprivation from virtually the entire front yard of the plaintiffs of the lake view denies the plaintiff tenant his full enjoyment of the property. Further, such a deprivation is a harm for which there is no adequate remedy at law. Conversely, however, neither plaintiff presented any evidence of legal damages arising from the fence, such as testimony from an appraiser of a decrease in property value as a result of the loss of the lake view. In sum, Gordon Geiger has established the essential elements of § 52-480 as set forth above, but not those of § 52-570, for the front most single section of the fence between the parties' property. Therefore, the court orders the defendant to remove the front most section of the fence on or before June 30, 2015. For clarity's sake, the court reminds the parties that this section is depicted as the left of the two fence sections found on defendant's exhibit J-1. The defendant is further enjoined permanently from placing any additional structure on the site of this fence section ordered removed by this court.

The court finds no basis for the award of punitive damages as a result of the orders it has entered on count three. See *Bernardini* v. *Lombard*, Superior Court, judicial district of Litchfield, Docket No. CV-01-0086276-S (March 14, 2003, *Frazzini, J.*) (34 Conn. L. Rptr. 305) (granting motion to strike claim for punitive damages because punitive damages are not available under § 52-480).

C

Defendant's Counterclaim

1

Claims Against Elizabeth Geiger

The defendant did not present any evidence against Elizabeth Geiger, so judgment enters in favor of Elizabeth Geiger and against the defendant on all causes of

action contained in the counterclaim.

## 2

### Statute of Limitations Issues

The general tort statute of limitations, § 52-577, governs all of the tortious causes of action presented in the counterclaim except for the defendant's claim of negligent infliction of emotional distress:[15] private nuisance, trespass, and intentional infliction of emotional distress. *Lambert* v. *Stovell*, 205 Conn. 1, 4, 529 A.2d 710 (1987) ("[t]he three year provision of § 52-577 is applicable to all tort actions other than those excepted therefrom by § 52-584 or other sections"), superseded on other grounds, *Shortell* v. *Cavanagh*, 300 Conn. 383, 15 A.3d 1042 (2011). Section 52-577 provides that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." See also *Rickel* v. *Komaromi*, supra, 144 Conn. App. 782. "The three year limitation period of § 52-577, therefore, begins with the date of the act or omission complained of, not the date when the plaintiff first discovers an injury. . . . The relevant date of the act or omission complained of, as that phrase is used in § 52-577, is the date when the negligent conduct of the defendant occurs and not the date when the plaintiffs first sustain damage. . . . Ignorance of his rights on the part of the person against whom the statute has begun to run, will not suspend its operation. . . . When conducting an analysis under § 52-577, the only facts material to the trial court's decision . . . are the date of the wrongful conduct alleged in the complaint and the date the action was filed." (Citation omitted; internal quotation marks omitted.) *Kidder* v. *Read*, 150 Conn. App. 720, 726–27, 93 A.3d 599 (2014).

## 3

### Counterclaim Count One

As set forth above in the findings of fact section pertaining to count one of the counterclaim, all of the evidence submitted to support the private nuisance cause of action related to events that took place more than three years before the filing of the counterclaim, on February 7, 2014. As a result, the defendant has not presented any competent evidence from which to satisfy the elements of a cause of action in private nuisance.[16] The defendant's cause of action in private nuisance is, thus, time barred under § 52-577 and judgment enters in favor of Gordon Geiger and against the defendant on the claim of private nuisance.

## 4

### Statute of Limitations Issues in Other Tort Counts

Similarly, the following events offered by the defendant as evidence to support the causes of action in trespass, intentional infliction of emotional distress, and negligent infliction of emotional distress cannot

support any of these claims because each of these events occurred more than three years before the defendant filed his counterclaim: the claims relating to Gordon Geiger sitting at the spindle wheel "table" in the right-of-way (2006); Gordon Geiger placing boulders, debris, and fill on the defendant's driveway (July 19, 2010); and Gordon Geiger throwing ashes at the defendant's truck (October, 2009). *Piteo* v. *Gottier*, 112 Conn. App. 441, 446, 963 A.2d 83 (2009) ("the only facts material to the trial court's decision [related to a statute of limitations defense] are the date of the wrongful conduct alleged in the complaint and the date the action was filed" [internal quotation marks omitted]).

### 5

### Counterclaim Count Two: Trespass I

Defendant's Exhibit S-2 and the testimony of the witness Charles Barber demonstrate that Gordon Geiger has stored a backhoe near the entrance to the Carey Building Lot within the last three years.

### 6

### Counterclaim Count Three: Trespass II

Gordon Geiger has intentionally, during the winter of 2013 to 2014, blocked the entrance to the defendant's property with snow. Moreover, during the winter of 2010 to 2011, Gordon Geiger dumped snow onto four large arborvitae meant to provide a barrier between the defendant's and the plaintiffs' property, killing them. Defendant's exhibits H-1 through H-3 show large arborvitae buried under very large mounds of snow. The mounds of snow were so large that they could not have been moved and left in the position they were in without mechanical assistance. The snow was pushed onto the arborvitae from the plaintiffs' property. Gordon Geiger employed a backhoe in and around this time period. Gordon Geiger had motive to dump this snow on the defendant's barrier trees.[17] Although Gordon Geiger attempted to assert the statute of limitations as a defense to this claim, he failed to sustain his burden of proof because he did not provide any evidence that these actions occurred more than three years before February 7, 2014, the date on which the counterclaim was filed. The court takes judicial notice of the fact that the value of even large arborvitae is less than the evidence offered and finds the value of the arborvitae to be $100 each.

### 7

### Counterclaim Count Four: Trespass III

Gordon Geiger's tree platform encroaches onto the defendant's property. Additionally, the tree platform was built so close to the defendant's house, approximately fifty feet at the closest point, that it provides a bird's eye view into the defendant's home. This constitutes a stark, unreasonable, and intentional invasion of

the defendant's privacy. Gordon Geiger's children play on the platform at least two times a week. Gordon Geiger has also been up on the platform on several occasions.

8

## Conclusions of Law, Orders, and Rulings Common to All Three Trespass Counts in the Counterclaim

Gordon Geiger did not submit any documentary evidence proving the nature and extent of his right to pass and repass on the right-of-way. The defendant has judicially admitted, however, that Gordon Geiger, as a tenant to Elizabeth Geiger, has such rights. The court holds that Gordon Geiger, as long as he is a tenant at 58 Tyler Lake Heights Road, maintains, and, in the event he were to become the owner of the Geiger Property in the future, would maintain the rights to pass and repass on the right-of-way. Gordon Geiger's rights to use the right-of-way are, however, limited to the right to pass and repass on the right-of-way. The court holds that Gordon Geiger does not have the right to sit on or loiter on the right-of-way. The court also holds that Gordon Geiger does not have the right to perform operations that change the composition of the right-of-way. The court permanently enjoins Gordon Geiger from (1) storing materials on the right-of-way, (2) blocking access via the right-of-way to either the Carey Property or the Carey Building Lot with items, (3) sitting or loitering on the right-of-way, or (4) performing operations on the composition of the material in the right-of-way. Such activities have created and/or would create harm to the defendant for which there is no adequate remedy at law.

The court finds that there is no adequate remedy at law for the harm sustained by the defendant because Gordon Geiger has blocked the entrance to the defendant's driveway or to the right-of-way with snow. The court permanently enjoins Gordon Geiger from blocking the entrance to either the defendant's driveway or the street entrance to the right-of-way with snow.

The court orders Gordon Geiger to pay the defendant $400 in damages for the loss of the arborvitae. Payment of this sum may be made over a twelve month period of time from the date of this ruling.

The court finds that there is no adequate remedy at law for the harm sustained by the defendant resulting from the presence of the tree platform. The court orders Gordon Geiger to remove the tree platform on or before June 30, 2015. The court permanently enjoins Gordon Geiger or anyone acting on his behalf, or on behalf of Elizabeth Geiger, from building any similar structure over any portion of the remaining fence.

9

### Counterclaim Count Five: Quiet Title

Although captioned as a count to quiet title, count five of the defendant's counterclaim actually reads as a request for the court to restrain and enjoin Gordon Geiger's use of the tree platform. The court disposed of these issues in the previous section. To the extent that the defendant is requesting the court to quiet title to the fence and to the air space above it, the court finds in favor of the defendant.

The essential elements of a quiet title action comprise "a statement of the plaintiff's ownership of the land described or of an interest in it, and of his title thereto . . . [and a contrary claim] that his title or interest is in controversy, that is, that it is so effected by claims of the defendant as to justify the litigation." (Citation omitted.) *Gager* v. *Carlson*, 146 Conn. 288, 289, 150 A.2d 302 (1959). In a quiet title action, the court must first "determine in which party record title lies . . . ." (Internal quotation marks omitted.) *Har* v. *Boreiko*, 118 Conn. App. 787, 794, 986 A.2d 1072 (2010). The court holds that the defendant owns record title to the land on which the fence is located. The court further holds that the defendant owns the airspace above the fence, which sits twenty inches onto the defendant's property. Unlike many other quiet title actions, there is no real question as to which party owns the property on which the fence sits or the airspace above the fence. Aside from claiming at trial that the tree platform was not trespassing on the defendant's property, Gordon Geiger did not advance any colorable claim to this property. Therefore, the court holds that title to the property where the fence is located and to the airspace above such property belongs to the defendant.

10

### Counterclaim Count Six: Intentional Infliction of Emotional Distress and Counterclaim Count Seven: Negligent Infliction of Emotional Distress

The court will first review the essential elements of each cause of action.

"In order for the plaintiff to prevail in a case for liability under . . . [intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. . . . Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. . . . Only where reasonable minds disagree does it become an issue for the jury." (Citation omitted; internal quotation marks

omitted.) *Gagnon* v. *Housatonic Valley Tourism District Commission*, 92 Conn. App. 835, 846, 888 A.2d 104 (2006).

"Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society . . . . Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous! . . . *Appleton* v. *Board of Education*, 254 Conn. 205, 210–11, 757 A.2d 1059 (2000)." (Internal quotation marks omitted.) *Reyes* v. *Bridgeport*, 152 Conn. App. 528, 543 n.13, 100 A.3d 50 (2014).

"[I]n order to prevail on a claim of negligent infliction of emotional distress, the plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm. . . . *Larobina* v. *McDonald*, 274 Conn. 394, 410, 876 A.2d 522 (2005). The elements of a claim of negligent infliction of emotional distress are as follows: (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress. *Carrol* v. *Allstate Ins. Co.*, [262 Conn. 433, 444, 815 A.2d 119 (2003)]. [T]he elements of negligent infliction of emotional distress do not require proof of any particular level of intent. In fact, intent need not be proven at all to establish a claim of negligent infliction of emotional distress. *Stohlts* v. *Gilkinson*, 87 Conn. App. 634, 645, 867 A.2d 860, cert. denied, 273 Conn. 930, 873 A.2d 1000 (2005).

"As to the first and second elements of the claim, they essentially [require] that the fear or distress experienced by the plaintiffs be reasonable in light of the conduct of the defendants. If such [distress] were reasonable in light of the defendants' conduct, the defendants should have realized that their conduct created an unreasonable risk of causing distress, and they, therefore, properly would be held liable. Conversely, if the [distress] were unreasonable in light of the defendants' conduct, the defendants would not have recognized that their conduct could cause this distress and, therefore, they would not be liable. . . . *Larobina* v. *McDonald*, supra, 274 Conn. 410.

"The third element of the claim is [t]he foreseeability requirement [which] is more specific than the standard

negligence requirement that an actor should have foreseen that his tortious conduct was likely to cause harm. . . . In order to state a claim for negligent infliction of emotional distress, the plaintiff must plead that the actor should have foreseen that her behavior would likely cause harm of a specific nature, i.e., emotional distress likely to lead to illness or bodily harm. . . . *Olson* v. *Bristol–Burlington Health District*, [87 Conn. App. 1, 5, 863 A.2d 748, cert. granted, 273 Conn. 914, 870 A.2d 1083 (2005)] [(withdrawn by party after certification granted)]." (Internal quotation marks omitted.) *Woodbury-Correa* v. *Reflexite Corp.*, Superior Court, judicial district of New Britain, Docket No. CV-11-6011794-S (December 15, 2014, *Abrams*, *J.*).

Although these two separate causes of action differ in many regards, they share in common one factor: the harm that must be proven in order for the counterclaim plaintiff to succeed must be serious. Intentional infliction of emotional distress requires that the emotional distress sustained be "severe." *Gagnon* v. *Housatonic Valley Tourism District Commission*, supra, 92 Conn. App. 846. Negligent infliction of emotional distress requires that the emotional distress be "severe enough that it might result in illness or bodily harm . . . ." *Carrol* v. *Allstate Ins. Co.*, supra, 262 Conn. 444. Intentional infliction also requires that the conduct alleged be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (Internal quotation marks omitted.) *Appleton* v. *Board of Education*, supra, 254 Conn. 211.

Although the defendant testified that Gordon Geiger, in January of 2014, parked his car on the right-of-way outside of the defendant's house and stared at him, the court holds that the defendant did not sustain his burden of proving that this event had occurred.

What remains for the defendant in terms of proven evidence are two sets of events that occurred within the last three years.[18] Gordon Geiger blocked the defendant's driveway entrance with snow and told the defendant that his driveway rights were being revoked. Gordon Geiger accosted the defendant and three friends, insulted one of them by referring to a car accident, made a slightly pejorative pun of the name of another, insulted the defendant for drinking episodes, and told the four that he intended to be around for forty years, and that he didn't intend to be civil. Gordon Geiger also referred to himself by means of using a racial slur.

In the court's eyes, none of the harm allegedly arising from these incidents rises to the level of "severe" emotional distress, for purposes of the intentional infliction of emotional distress count or emotional distress "severe enough that it might result in illness or bodily

harm" for purposes of the negligent infliction of emotional distress count. Granted, the feelings engendered by such encounters would not be pleasant, but they are also not likely to cause severe emotional distress. Moreover, although falling well below the standards of decency of a civilized society, the conduct of Gordon Geiger was not outrageous, intolerable, or atrocious. As a result, the court finds for Gordon Geiger and against the defendant in regard to both the intentional and the negligent infliction of emotional distress counts.

The court finds no basis for the awarding of punitive damages for any aspect of the counterclaim for which recovery was allowed.

VI

Conclusion

The court rules for the defendant and against the plaintiffs on counts one and two of the revised complaint. In regard to count three of the revised complaint, the court rules in favor of the plaintiffs and against the defendant and orders the defendant to remove the one section of the fence between the parties' properties closest to the street on or before June 30, 2015. The defendant is further permanently enjoined from building another structure on the portion of the defendant's property where that portion of the fence is currently located.

The court rules as follows as to the counterclaim. The court rules for the plaintiff Elizabeth Geiger and against the defendant for all counts of the counterclaim as they relate to Elizabeth Geiger. The court rules in for Gordon Geiger and against the defendant for counts one, six, and seven of the counterclaim. The court rules for the defendant and against Gordon Geiger for counts two, three, four, and five of the counterclaim. The court orders that while Gordon Geiger maintains his right, so long as he is a tenant or owner of 58 Tyler Lake Heights Road, to pass and repass on the right-of-way, the court permanently enjoins Gordon Geiger from stopping or loitering on the right-of-way. The court also permanently enjoins Gordon Geiger from placing any barriers, barricades, or items on the right-of-way. Further, the court orders Gordon Geiger to take down his tree platform on or before June 30, 2015, and permanently enjoins him from erecting a similar structure over the fence between the parties' property. Finally, the court awards damages in the amount of $400 to the defendant for the damage to his arborvitae, to be paid by Gordon Geiger to the defendant within twelve months of this ruling.

[1] When the court refers to "the parties," the court means Gordon and Elizabeth Geiger, on one hand, and the defendant, on the other hand. When the court refers to the "party," the court means, based on the context, either both Gordon and Elizabeth Geiger or the defendant.

[2] Gordon Geiger's attempt to appear on behalf of his mother is ineffective under Connecticut law. "The authorization to appear pro se is limited to

representing one's own cause and does not permit individuals to appear pro se in a representative capacity." *Expressway Associates II* v. *Friendly Ice Cream Corp. of Connecticut*, 34 Conn. App. 543, 546, 642 A.2d 62, cert. denied, 230 Conn. 915, 645 A.2d 1018 (1994). Elizabeth Geiger presented no evidence aside from one small portion of testimony attempting to rebut one aspect of a defense set forth. Therefore, because Gordon Geiger could not put on evidence for Elizabeth Geiger, findings entered in favor of the plaintiff shall only enter on behalf of Gordon Geiger.

[3] "[T]he right of self-representation [however] provides no attendant license not to comply with relevant rules of procedural and substantive law." (Internal quotation marks omitted.) *Rowe* v. *Goulet*, 89 Conn. App. 836, 841, 875 A.2d 564 (2005).

[4] This building lot is located to the rear of and to the east of the defendant's home.

[5] The facts found in each subsection apply to the entire decision. Headings employed by the court are used for illustrative purposes and for the convenience of the reader.

[6] Lockaby and Perrault's motion for permission to withdraw as attorneys for Elizabeth Geiger states that Elizabeth Geiger quitclaimed the property to Gordon Geiger on July 23, 2009. The December 5, 2013 revised complaint, however, identifies Elizabeth Geiger as the owner of the property and states that Gordon Geiger has "full possession rights" to the property. At trial, Gordon Geiger testified that his mother quitclaimed her interest to him "[i]n a deed that's not recorded with the town." Gordon Geiger did not submit the deed into evidence. Under General Statutes § 47-10, while an unrecorded deed is effective between the parties to the deed, the failure to record the deed renders it ineffective against other parties.

[7] The defendant's testimony in this regard was essentially uncontroverted. When Elizabeth Geiger testified concerning this call and a similar call pertaining to the retaining wall, she did not contradict the defendant's testimony, but simply said that she did not "recall any phone calls about that." Trial Tr., 156:14–17.

[8] Please See footnote 7 of this opinion.

[9] Connecticut law has long held that "a court has discretion to permit the fact-finder, be it court or jury, to view the premises or a location relevant to the trial. . . . Evidence obtained from views is substantive evidence and can independently support a factual finding." (Internal quotation marks omitted.) *Barber* v. *Skip Barber Racing School, LLC*, 106 Conn. App. 59, 68, 940 A.2d 878 (2008).

[10] All headings employed in the "Conclusions of Law, Rulings and Orders of the Court" section are meant to be illustrative only and are used for the reader's convenience. The application of each such conclusion of law, ruling and order is governed by what the court has written in the body of the decision, rather than in the headings.

[11] The plaintiffs were certainly hamstrung on issues of proof in this regard as it appears from the testimony that neither one lived on the property until April, 2006, and neither seemed to have any personal knowledge of facts supporting their claims in counts one and two.

[12] The three year statute of limitations does not apply to the retaining wall, as its presence is alleged to be a continuing trespass. See *Rickel* v. *Komaromi*, supra, 144 Conn. App. 775.

[13] There was testimony at trial that much later piping and drainage activities of Gordon Geiger may have rendered the retaining wall remedy unnecessary, but such activities do not alter the court's conclusion that the retaining wall provided a very important benefit to the plaintiffs for many years after Elizabeth Geiger gave the defendant permission to construct it.

[14] It is noteworthy that the fence has proven useful to Gordon Geiger as well. He has built a swing and a slide for his children on his side of the fence. Trial Tr., 136:24–137:2. During the court's site visit, the court observed that Gordon Geiger stores firewood up against the fence. Moreover, defendant's exhibits K-2 and K-3, taken in conjunction with the defendant's testimony, demonstrate that the parties shared a desire for physical separation, as Gordon Geiger built a wire fence demarking the property line between two sections of the defendant's wooden fence in 2006.

[15] The defendant's negligent infliction of emotional distress claim is governed by the statute of limitations found in General Statutes § 52-584 because it involves a personal injury caused by a party's negligence. *Rivera* v. *Double A Transportation, Inc.*, 248 Conn. 21, 31, 727 A.2d 204 (1999). Section 52-584 limits claims to those brought within two years of injury or the discovery of harm, but places an outer limit of three years from the date of the

occurrence of the act or omission alleged. In contrast, the defendant's intentional infliction of emotional distress claim, as an intentional tort, is governed by the three year statute of limitations found in § 52-577. *Burke* v. *Klevan*, 130 Conn. App. 376, 377 n.1, 23 A.3d 95 (2011), cert. denied, 302 Conn. 936, 28 A.3d 990, cert. denied, U.S. , 132 S. Ct. 1637, 182 L. Ed. 2d 234 (2012).

[16] " '[I]n order to recover damages in a common-law private nuisance cause of action, a plaintiff must show that the defendant's conduct was the proximate cause of an unreasonable interference with the plaintiff's use and enjoyment of his or her property. The interference may be either intentional . . . or the result of the defendant's negligence.' *Rickel* v. *Komaromi*, [supra, 144 Conn. App. 783]. 'Whether the interference is unreasonable depends upon a balancing of the interests involved under the circumstances of each individual case . . . the fact finder must take into consideration all relevant factors . . . the fact finder deems relevant to the question of whether the interference is unreasonable.' *Petsey* [v. *Cushman*, 259 Conn. 345, 361, 788 A.2d 496 (2002) ]. As to the intent element, '[i]f the creator of the condition intends the act that brings about the condition found to be a nuisance, the nuisance thereby created is said to be absolute and its creator is strictly liable.' *Quinnett* v. *Newman*, 213 Conn. 343, 348, 568 A.2d 786 (1990), overruled in part on other grounds, *Craig* v. *Driscoll*, 262 Conn. 312, 813 A.2d 1003 (2003)." *Johanns* v. *Meriden*, Superior Court, judicial district of New Haven, Docket No. CV-13-6039855-S (December 1, 2014, *Wilson, J.*).

[17] While the defendant did not present direct evidence of Gordon Geiger dumping snow on to the arborvitae, the court finds that sufficient circumstantial evidence was submitted to conclude that Gordon Geiger dumped snow on to the arborvitae in the winter of 2010 to 2011. "Proof by circumstantial evidence is sufficient where rational minds could reasonably and logically draw the necessary inferences. . . . Each inferential fact need not be proven by the quantum of proof required to find the ultimate fact." (Citation omitted.) *Falls Church Group, Ltd.* v. *Tyler, Cooper and Alcorn, LLP*, 281 Conn. 84, 110, 912 A.2d 1019 (2007).

[18] As previously noted, the defendant's intentional infliction of emotional distress claim is governed by a three year statute of limitations, found in § 52-577. The defendant's negligent infliction of emotional distress claim is governed by the statute of limitations found in § 52-584, which has an outer limit of three years from the date of the act of omission alleged to have caused the harm to the party making the allegation.